Louis L. Friedman, J.
On March 23, 1954 plaintiff, a man about 54 years of age, was driving his automobile in a northerly direction along the East River Drive. His wife was seated alongside of him in the front of the car. It was a dry day, and the left-hand driver’s window of the automobile was open. After he had passed 95th Street and was approaching 96th Street, a shower of pieces of concrete came into his automobile through the open window, one of them striking him in the left eye. By the time he realized that he was hit, his car had gone past the 96th Street intersection, and when he realized that blood was streaming down his face, he hurriedly drove to the next exit at 116th Street, secured the assistance of a policeman who was there and who then drove him to a nearby hospital. At the hospital it was found that the injury was so severe that his eye had to be removed. When the car was examined by the policeman, four pieces of broken concrete, marked into evidence on this trial, were found in the automobile.
As a result of this accident, suit was brought against the defendant Frank Mascali & Sons, Inc. The proof showed that this corporation had a large contract for the construction of an overpass between East 92nd Street and East 99th Street along the East River Drive. The contract showed that the said corporation, hereinafter sometimes referred to as “Mascali”, received a lump sum for the purpose of maintaining the traffic along the highways and providing for safety precautions with respect thereto. The work to be done under the contract was to be under the supervision and direction of an engineering firm lmown as Brown and Blauvelt, selected by the Triborough Bridge & Tunnel Authority, on whose behalf the work was to be performed. Part of the work included demolition of the under-structure of a power house at that location, the upper portion of which had been torn down by some other subcontractor. The area where the power house originally stood had to be filled in so that it was level with the rest of the surrounding road surface. Thus, any excavations resulting from the power house demolition, were filled in and made level by the use of both extra fill brought from somewhere else and such material as was found in the construction area. It is without serious dispute that part of this fill consisted of broken concrete, and that *1040 some of this broken concrete, caused by the destruction of surrounding sidewalks or foundation walls, had to be broken into smaller pieces before it could properly bo used for the filling operation.
It was conceded by the defendant, both by way of examination before trial and during other testimony given upon the trial, that it had a crane on the job and that this crane was used for a number of different types of operation. One of these operations was breaking up concrete by the use of a two and one-half - ton steel ball which, when used, was attached to the cable of this crane, lifted some distance into the air over the concrete to be broken, and then dropped on said concrete to break it into smaller pieces. It was plaintiff’s contention on the trial that defendant was doing this kind'of work as plaintiff was driving by, that the breaking of the concrete caused pieces to fly into the air and across the drive, and that it was this flying concrete which flew into plaintiff’s ¿ar, one of the pieces causing the injury to which reference has already been made.
The case was tried before the court and a jury over a period of several days, and after about six hours of deliberation, the jury rendered a verdict in favor of the defendant by a vote of 10 to 2. Plaintiff has moved to set aside this verdict on all of the usual grounds, and it is this motion which must be here determined. Thus," an analysis of the testimony, as well as the court’s reasons for its conclusion, hereinafter set forth are now indicated.
Plaintiff’s wife said that she was an actual witness to the occurrence. She said that as they were driving along the highway between 95 th and 96th Streets, she saw the crane with the ball.attached in operation, and that as her husband’s car got opposite the crane, the shower of stones suddenly came in through the window. She testified to finding the stones in the car later on, as well as the facts with respect to the policeman’s help in getting medical treatment for her husband. On cross-examination, she was asked whether she had ever told the policeman that a car going in a southerly direction had passed by, and that a stone from that car, thrown at her husband, was the cause of his injury. She denied having said so, or having made a similar statement at the hospital. .When called to the stand later, her husband corroborated her story, although he did not actually see very much of the crane in operation since, as he said, he only glanced at it for a brief moment as he was driving by. He did testify however, to the shower of stones coming through the window and causing his injuries. On cross-examination, he was pressed with respect to some changes made by *1041 him before he signed an examination before trial in which he had testified under oath, and much was later made before the jury, during summation, of the fact that before' so signing the examination, changes were made therein. While perhaps impressive with the jury, the law permits those who are examined before trial to read over their testimony prior to signing and returning it, and it is well recognized that after giving testimony, changes are often made necessary by reason of later and more deliberate reflection as to the facts, or sometimes by reason of errors made by the stenographer who took the examination. As a matter of fact, in this very trial, an examination before trial taken by the plaintiff of the defendant’s construction engineer, contained similar material changes, but since that examination before trial was not physically received in evidence by reason of objections made to some of the questions therein, these changes never came before the jury.
A policeman who was assigned to the post at the corner where the crane was operating, testified that he had actually seen this operation of the crane with the steel ball attached (called “ balling ”) taking place on the day of the occurrence. He was able to fix the date, because two weeks prior thereto another similar incident had occurred which he witnessed and which he had reported in his memorandum book, and in that prior incident, an automobile driving along East 96th Street near the East River Drive, was struck by concrete thrown up when the balling operation took place. The policeman said that folloAving the prior occurrence, he warned the operator and some of the supervisors on the job, about the method of -doing this balling operation, and he fixed the 23rd of March as the day when he saw the defendant once again doing this balling operation, by reason of the fact that on the day following, he heard about plaintiff’s accident, and the loss of plaintiff’s eye by reason thereof.
In an examination before trial taken of the defendant, it was admitted by Mascali’s construction engineer, who was produced upon such examination, but who was never produced in court upon the trial, that balling operations did take place in the manner hereinbefore described; that on occasions there would be some flying of rocks or broken concrete as a result of this balling operation; that there were progress sheets as well as other records used by the defendant which indicated that work was done and which otherwise indicated that plaintiff’s claim as to how this accident happened, could not be cast aside as improbable.
Except for medical proof, this was the substance of plaintiff’s case. Received in evidence, were portions of the contract *1042 entered into between the Triborough Bridge and Tunnel Authority and defendant Mascali, the four stones found in the car, a number of photographs of the location (at least one of which showed this iron ball where it had been left on the ground right about at the area where this accident took place), the supervisory records from Brown and Blauvelt and more particularly their diary of March 23, 1954. Other exhibits were later received in evidence during the course of the defendant’s case, and some of the exhibits hereinbefore referred to also were received after plaintiff had rested. Significant in the records of Brown and Blauvelt, was the notation that at 8:30 in the morning of the day of the occurrence, a complaint had been made by the supervising engineering firm to defendant Mascali, to the effect that the fill which was being used consisted of concrete pieces which were too large. It was testified to, that such complaint or instructions from the engineering firm to the defendant were continuous, and it leaves very little to the imagination, to properly and reasonably infer that in order to rectify the conditions which caused this complaint and which necessitated these instructions that Mascali broke up the concrete which was lying around, so that it would be small enough to be used as proper fill material. But most significant is the fact that having been told specifically about this on the day of the occurrence, there is no doubt that balling operations took place later that day for the purpose of breaking the larger concrete into smaller pieces.
There was other testimony from the policeman about balling operations which caused showers of stone on other days prior to the day of this accident, and although the policeman’s credibility was attacked during the course of cross-examination and during summation by defendant’s counsel, the court is convinced that he was telling the truth and that there was no real reason to reject his testimony. He was disinterested, and his testimony must be viewed in that light.
But equally important to the determination of this motion, is the testimony and proof which was elicted during the so-called defense, which in the court’s opinion was no defense at all. One John E. McAnany, the engineer employed by Brown and Blauvelt, testified that it was he who supervised this job. He admitted that Officer Baldine had notified his company about these balling operations and the manner in which it was being done, and he testified that the records of his firm contained some indication as to the prior incident on March 8, 1954. Although offered, the records were not admitted into evidence because some reference was therein contained which was properly objec *1043 tionable. But his testimony left no doubt of the fact that Officer Baldine had made some complaints about the method in which balling operations were taking place, and that at least one, if not more, prior incidents of injury or damage from flying rock sent through the air because of these, balling operations, had been reported to his firm. He could not remember whether a ball had been used that day, but said “ that it might have been used.” His records made no reference to this operation one way or another. He was sure that the crane was also used for the purpose of pouring concrete and he did have a record that 71 cubic yards of concrete was actually delivered to the job that day, which was used for the construction of a 15-foot wall somewhat further south from the scene where this plaintiff’s accident took place. He could not testify positively whether the crane was actually used for the pouring of this concrete or not, and his records contain no indication with reference thereto, although he did testify that the crane must have been used.
Patrolman Cross, called by the defendant, testified that he was on duty at the same intersection up to 3 o’clock each day, when he was relieved by Patrolman Baldine, who testified for the plaintiff. He did not remember anything with respect to this accident and did not know for some time after it occurred, about its having happened. He admitted that he saw this ball being operated on various occasions, although he could not specify the time, and that occasional pieces of concrete flew as a result of the balling operation.
Patrolman McQuire was called by the defendant and he testified that he was the policeman who had driven plaintiff to the hospital. He held a 25-minute conversation with the then admittedly hysterical Mrs. Grutin and he reduced this conversation to a report which he made, and which consisted of just a few lines. His conclusion was that he had been told by Mrs. Grutin that a car going south on the East River Drive had thrown a stone, thus causing her husband’s injuries. He admitted that he found four stones in the car and, while he was not positive about them, he identified the pieces of rock in evidence as similar in size to the stones which were so found. He was unable to explain how four stones would be found in the car if, as Mrs. Grutin supposedly told him, a stone was thrown from another car. The policeman said that he had given the history of the accident to the hospital, and in the hospital record it is indicated that the history therein contained as apparently given by the policeman, is somewhat different from his version as testified to on the trial.
*1044 Albert De Fonzo was the crane operator who manipulated the controls which did the balling operation or did other work on the job. He denied remembering anything about this accident or about any incidents on that day or at any other time. His memory was very hazy.for anything which had occurred. A statement was shown to him which he admitted that he had seen and which, after reading over, he admitted was the truth. He admitted that he would never sign any document unless he had read it over and unless it was in fact the truth, and after being-given an opportunity to read it over on the witness stand before answering, he admitted that the facts therein stated had been the truth when he signed the statement and were still the truth as he was testifying on the stand. That statement was received in evidence and in it Mr. De Fonzo affirmatively stated that on the day of this accident, at about the time when it occurred, he was performing a balling operation with this cran'e and that some pieces of concrete flew through the air and struck a blue car which was passing on the East Biver Drive, doing, so far as he knew, slight damage. The proof showed that plaintiff’s vehicle was in fact a blue car.
Edward F. Byan was an engineer (although not licensed) employed by the defendant. He brought some records of the job to court with him, and these records consisted of some delivery slips which showed that on the day of the occurrence, 50% cubic yards of Class B concrete (used for footings) and 16% cubic feet of Class D concrete (used for smooth surfaces) had been delivered to the site of this job between 10:35 a.m. and 4:30 p.m. Five of these slips contained thereupon a notation that the delivery truck had been held up because the crane had broken down. An attempt by the defendant to thus show that the crane could not have been used for balling operations, because it was actually being used to pour this concrete, was negatived by its own contentions that the crane had in fact broken down. These delivery slips contained thereupon the handwriting of someone at the office of the concrete manufacturer from where the delivery was initiated, the handwriting of the driver who signed his name to the slip, and the handwriting of defendant’s employee who received the concrete. Surprisingly, the notation about the crane having broken 'down, was not in the handwriting of any one of these three persons. Equally indicative that something was not quite right, was the fact that although it was claimed that no concrete could have been delivered without the use of this crane, some of the trucks which made such deliveries, left the defendant’s place of work with their deliveries supposedly completed, while the crane was *1045 •still broken, and before another truck even arrived. Thus, on the truckload of concrete which arrived at 1:30 p.m., the record indicated that delivery was completed at 2:20 p.m., even though the crane had broken down. The delivery ticket of the truck which arrived at 2:20 p.m. also showed that the crane was broken down, and no explanation was ever offered as to how the 1:30 p.m. truck, which left at 2:20 p.m., could have possibly completed its delivery and left by that later time, if when another truck arrived at 2:20 p.m., it was found that the crane was then still broken as noted on that delivery ticket. The court is convinced that these notations on these delivery tickets were something which never appeared thereupon when these tickets were first completed; that they were added to for the purposes of this trial and for this trial only, and that fraud was practiced upon the court and the jury in their introduction into evidence.
When Mr. Ryan was cross-examined, he denied that stones from the balling operations were ever thrown into the roadway, and this testimony was shown to be untrue when he was confronted with a statement which he himself had signed and which he admitted was true, in which he stated that such incidents actually did take place.
The only other witness who testified for the defendant, was the vice-president of the concrete company. He said that nine trucks of Class D concrete were delivered that day. Although 40 or 50 other slips showing concrete deliveries were received in evidence, none of them had any notation of the crane breaking down, and all of the slips which bore such notation were confined to the time period between 1:15 p.m. and 3:40 p.m., between which times this accident happened, The bill of particulars showed that plaintiff’s accident took place at 3:15 p.m., and the court is convinced that it is no mere coincidence that the delivery ticket which showed the first delivery (3:30 p.m.) after the accident, had no notation thereupon about the crane having broken down.
Plaintiff lost an eye at a time when he was an innocent passerby on the highway. The defense to his claim against this defendant was, and could only have been, that no balling operation was taking place at that time, and that defendant is therefore not chargeable with the flying of stones into plaintiff’s car. In support of that defense, the only evidence submitted was that balling operations could not have been taking place, because the crane was being used for the pouring of concrete. But surprising as it may seem, there was no direct evidence that this crane was in fact ever used for the pouring of concrete. The evidence was circumstantial, and from it the jury was asked to *1046 come to the conclusion that the crane was being used other than for balling. The crane operator himself did not remember the occurrence, and upon cross-examination actually admitted that the statement which he signed was true and in said statement he verified that he had in fact been doing balling operations at the time of plaintiff’s accident. Mr. Ryan, the engineer, was only able to testify that the concrete was delivered to the job, but he had no independent recollection nor any records such as progress or work records which actually showed what the crane was doing. When pressed for the production of the work-progress and other records of Mascali, Mr. Ryan said that there were none and that his firm never kept a progress record. His attention was called to the testimony of the construction engineer, Sheldon Richmond, as given during the examination before trial, and particularly to that portion where Mr. Richmond admitted that there were progress sheets, and Mr. Ryan denied that he had ever seen any. A subpoena duces tecum was received in evidence, through which plaintiff had attempted by subpoena to force the production of defendant’s records, and these records were never produced upon the trial, with the exception, as heretofore stated, of the few delivery slips which showed the delivery of concrete.
The court is convinced that a gross miscarriage of justice has taken place, which it is this court’s duty to correct. Plaintiff was an innocent victim of this accident and should not be deprived of just compensation for his most serious injury, on the basis of the kind of defense which has been interposed, and by reason of the concealment by the defendant of its progress records. No large corporation, doing a job as vast as the one which Mascali was doing, could possibly carry on its work properly, without having a daily progress record or progress sheet showing what work was done each day. There can be no doubt, after reading the testimony of Mr. Richmond as given upon the examination before trial, that such a progress sheet was kept by this defendant. Yet this record and all other records, were kept from the courtroom and thus concealed from the court and jury. Plaintiff, in the middle of this trial, was of course in no position to force the production of these books and records even though a subpoena therefor had been served, and no officer of the defendant corporation ever came into court in response to the subpoena to deny that any such books were in existence. Plaintiff has been seriously prejudiced by the failure to respond to this subpoena.
This court recognizes that the verdict of a jury may not be lightly disturbed and that the jury are the triers of the facts. *1047 But as has been pointed out on other occasions, this rule must give way to the primary objective of the court that justice be served, and that when palpably obvious, no injust result should be tolerated. In the face of the documentary and other proof in this case, the inferential evidence offered by the defendant to the effect that no balling operation was taking place, must be disregarded. In the face of the documentary proof in the form of a statement signed by the crane operator to the effect that he was actually performing a balling operation at the time of this occurrence and that such balling caused stones to fly, hitting a blue car such as the one driven by plaintiff, the denials that balling operations were actually taking place should not even have been considered. And in the light of the presence of the four pieces of concrete in evidence in the plaintiff’s car when the police officer took him to the hospital, the supposed statement of plaintiff’s wife that a stone was thrown by a car passing in the opposite direction, must be charged either to a misinterpretation by the police officer of the substance of the 25-minute conversation which he had with Mrs. Gutin in her then admittedly hysterical condition, or a faulty recollection, when he later prepared his accident report, as to what she had told him.
The court feels that the verdict of this jury is attributable in great measure to some remarks made during summation by defendant’s counsel. He began his summation by saying to the jury: “Blessed is the man who is without blemish and who seeketh not gold.” He then went on to quote from the Bible at some length after which he reverted to his interpretation of the facts in the case.
During the course of his summation he told the story of ‘ ‘ Susanna and the Elders ’ ’. As he told it, it was the story of two Jewish Elders in Israel in ancient times, who had together conspired to make false charges against Susanna and upon whose testimony she was convicted of adultery. Defendant’s counsel emphasized throughout this story the similarity between what he contended was false testimony in this case, and the false testimony which was later revealed in the trial of Susanna. It was evident as this totally unwarranted part of the summation was being delivered to the jury, that an appeal to prejudice and passion was being made, that counsel, by his actions, was imperiling the very verdict which he sought. The full story of Susanna and the Elders appears in “ The Apocrypha, an American Translation by Edgar J. Goodspeed,” published by the University of Chicago Press. In this book it is stated that the story stands at the beginning of Daniel in the leading Greek *1048 manuscripts, and the introduction describes it as ‘ ‘ the account of the effort of two evil-minded Jewish Elders to take advantage of a virtuous woman, the wife of a leading Jew, and when she refused to submit, they charged her before the local court with immoral conduct.” Although most adroitly and cleverly woven into the summation by defendant’s counsel, it was readily apparent that what counsel was attempting to do by innuendo was to compare the defendant in the present case to Susanna while at the same time comparing plaintiff and his witnesses to the Elders who had formed a conspiracy to which reference has already been made. In the light of the attending circumstances, and the complexion of the jury, the appeal to prejudice appears to have had its desired effect particularly when the strength of plaintiff’s evidence in this case is taken into consideration. Especially is this so, when at the end of his summation, counsel again repeated his supposedly biblical admonition that ‘ ‘ Blessed is the man who is without blemish and who seeketh not gold.” It could have left the jury with only the feeling that any verdict for the plaintiff which would deprive the defendant of its “gold”, would be contrary to their own biblical teachings. (For reference also, see The Story of the Apocrypha by Edgar Groodspeed, both in the introduction and the story of Susanna, as contained in that text.)
Counsel for plaintiff failed to object when these prejudicial remarks were made to the jury, and the court feels that such failure was due in part to the court’s own admonition to both counsel made earlier in the trial, that interruptions during summation should not take place unless absolutely necessary. In any event, even though counsel for plaintiff failed to object, the court may still take cognizance of the prejudicial remarks and take appropriate action thereupon.
In Kohlmann v. City of New York (8 A D 2d 598) the Appellate Division in the First. Department reversed a judgment and ordered a new trial because of the trial tactics of plaintiff’s attorney in that case. They said: “ The judgment appealed from is unanimously reversed on the facts and on the law, and in the exercise of discretion, and a new trial ordered, with costs to appellant. Trial tactics of plaintiffs’ counsel in the manner and content of his cross-examination, his comments and the expression of his personal views, exceeded the bounds of propriety and evinced a determination to convey to the jury his own characterization and appraisal of the witnesses for the defendant. His conduct appears to have been calculated to influence the jury by considerations which were not legitimately before them, and cannot be dismissed as inadvertent, thought *1049 less or harmless. Parties to a trial, civil or criminal, have a right to have the case determined on the facts and the law applicable thereto. When misconduct of counsel in interrogation or summation so violates the rights of the other party to the litigation that extraneous matters beyond the proper scope of the trial may have substantially influenced or been determinative of the outcome, such breaches of the rules will not be condoned. (Simpson v. Foundation Co., 201 N. Y. 479; Cherry Creek Nat. Bank v. Fidelity & Cas. Co., 207 App. Div. 787 (on summation); People v. Carborano, 301 N. Y. 39; Loughlin v. Brassil, 187 N. Y. 128.) It is regrettable that despite the apparent strength of the plaintiffs’ case a new trial must be ordered in the interests of justice.”
In Cherry Creek Nat. Bank v. Fidelity & Cas. Co. (207 App. Div. 787) to which the Appellate Division referred in the Kohlmann opinion (supra) the prejudicial remarks were made during summation, and even though the court in that case ‘ ‘ chose apt and vigorous words to characterize the conduct ’ ’ of counsel, the Appellate Division reversed the judgment and directed a new trial, stating (pp. 790-791):
" The rule allowing counsel when addressing the jury the widest latitude in discussing the evidence and presenting the client’s theories falls far short of authorizing the statement by counsel of matter not in evidence, or indulging in argument founded on no proof, or demanding verdicts for purposes other than the just settlement of the matters at issue between the litigants or appealing to prejudice or passion. The rule confining counsel to legitimate argument is not based on etiquette but on justice. Its violation is not merely an overstepping of the bounds of propriety but a violation of a party’s rights. The jurors must determine the issues upon the evidence. Counsel’s address should help them to do this, not tend to lead them astray. (Cattano v. Metropolitan Street R. Co., 173 N. Y. 565.) The law is so insistent that misleading prejudicial matter shall not be allowed to enter jurors’ minds that under certain circumstances the asking of an incompetent question for an ulterior purpose, even though the question be not answered, will justify the setting aside of a verdict. (Cosselmon v. Dunfee, 172 N. Y. 507.) Breaches of the rule limiting counsel to a discussion of the evidence have become ah too frequent of late. It is time that the bar should realize that when counsel in a close case resort to such practices to win a verdict, they imperil the very verdict which they thus seek. (Graham v. Graham, 142 App. Div. 131; National Supply Co. v. Jebb, id. 256; Harris v. Eakins, 201 id. 257; Loughlin v. Brassil, 187 N. Y. 128; Simpson v. *1050 Foundation Co., 201 id. 479; Dimon v. N. Y. C. & H. R. R. R. Co., 173 id. 356; Cox v. Continental Insurance Co., 119 App. Div. 682; Williams v. B. E. R. R. Co., 126 N. Y. 96.)
“ The misconduct was repeated. It cannot be deemed inadvertent or harmless.” (To the same effect see People v. Castellano, 273 App. Div. 978 [2d Dept.]; Saunders v. Champlain Bus Corp., 263 App. Div. 683; Abbate v. Solan, 257 App. Div. 776; United States v. Lee Huen, 118 F. 442, 463; Commonwealth v. Kazules, 246 Mass. 564; Skuy v. United States, 261 F. 316.) In Hey v. Huss (7 Misc 2d 119, 122) the court set aside the verdict of a jury because of the improper tactics of trial counsel in “ injecting foreign and extraneous issues into a case which divert the attention of the jury from the facts which it should consider”. The court went on to say: “To permit such a verdict to stand would make the trial court a party to the improper tactics here used.”
In the Saunders case (supra, p. 684) the court reversed the judgments of the court below and directed new trials because of the reference made during the questioning of one witness as to his nationality, the court stating: 1 ‘ Virtues and vices are to be found in all races and creeds. No one branch of the human family has a monopoly on veracity. It seems to us that plaintiffs’ counsel was appealing to prejudice and passion. The basic principle of our jurisprudence is that every citizen regardless of his position, his property, his race or his creed, is entitled to equal and exact justice. We are convinced, therefore, that in the interests of justice the judgments and orders appealed from should be reversed and new trials granted, with costs to abide the event.”
In Tuthill v. de Vries (265 App. Div. 881 [2d Dept.]), the court said: “ The conduct of the defendant’s trial counsel and its possible prejudicial effect on the result attained warranted the setting aside of the verdict in the interests of justice. (Cherry Creek Nat. Bank v. Fidelity & Casualty Co., 207 App. Div. 787, 790; Summers Coal & Lumber Co., Inc. v. Bagshaw, 240 App. Div. 709; Passzehl v. Metropolitan Distributors, Inc., 259 App. Div. 1050.) ”
The actions of a trial court in setting aside an improper verdict have been several times approved by our appellate courts. Thus, in Zukas v. Lehigh Val. Coal Co. (187 App. Div. 315) the trial court, in spite of his belief that the verdict was procured by perjury, refused to follow that belief to its conclusion, and suggested that the Appellate Division pass upon it. The majority opinion held (p. 319) that since the Trial Judge believed that the verdict was improper, that ‘ ‘ he should have *1051 had the courage of his conviction and set it aside, and not, as apparently he did, pass the problem along to us for solution.” The decision was 4 to 1, Presiding Justice Jexks concurring in the reversal, but suggesting that the better practice would be to send it back to the Trial Justice to pass upon, stating (p. 320) that if the trial court ‘ ‘ be dissatisfied with the verdict as against the weight of evidence or contrary to the evidence ’ ’ it should grant a new trial and “ it is its duty to do so.”
In Harris v. Brooklyn & Queens Tr. Corp. (249 App. Div. 749) the same court said that “ The trial justice was in the atmosphere of the trial ’ ’ and if “he thought that the verdict was against the weight of evidence ” he should have followed the ruling in the Zukas v. Lehigh Val. Coal Co. case (supra) and set it aside.
In Post v. Kerwin (150 App. Div. 321, 322) the court said that a verdict may be set aside: “ And by such action the trial judge does not invade the province of the jury, for he but interferes to afford the submission of the facts to another jury, not in denial but in recognition of the principle that the jury are the ultimate judges of the facts.”
The court stated in Bauer v. Montague Mailing Mach. Co. (163 App. Div. 589, 591): “ But juries may be led into error, not alone from partiality or bias, but from the suggestive arts of advocates. The trial judge must, therefore, scrutinize what is said, and how it is told, in view of the interest of the witnesses, so that the verdict shall do substantial justice. (Ferguson v. Gill, 74 Hun 566.) This power is necessary and its exercise so salutary that no rules have been declared rigidly defining the conditions of granting a new" trial.”
The court further stated: “ The action of the trial court, with the witnesses before him, must be deferred to by a reviewing court, which can only read their testimony in print. To warrant reversal of such an order, the proofs must be so strong in favor of the verdict that we can say with a reasonable degree of certainty, that the trial court’s conclusion was wrong. (Aldridge v. Aldridge, 120 N. Y. 614.) ”
In Roistacher v. Hurley (34 N. Y. S. 2d 752, affd. 266 App. Div. 688), Mr. Justice Hallixax, then sitting in the Supreme Court, Kings County, had before him a motion to set aside a verdict in an action for wrongful death. The jury had rendered its verdict in favor of defendant and the motion was made by plaintiff to set it aside. Discussing the proposition enunciated in the Scheuerman v. Knapp Coal Co. case (238 App. Div. 874) that the court should be hesitant about setting aside a jury verdict in favor of defendant in a tort action, the learned Justice *1052 held, nevertheless, that an acceptance of the • verdict would result in an injustice, and granted the plaintiff’s motion to set aside the verdict and for a new trial.
In Dean v. Hotel Greenwich Corp. (21 Misc 2d 702) decided by Mr. Justice Babb, (Sup. Ct., New York County), the court, in a scholarly opinion, discussed the power of the court to set aside a jury verdict and direct a new trial pointing out (p. 705) that “ There is no standard by which to determine when a verdict should be set aside as against the weight of evidence. The decision depends upon the discretion of the court (McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 66, 69; General Exch. Ins. Corp. v. New York City Tr. Auth., 20 Misc 2d 2; see Mann v. Hunt, 283 App. Div. 140).” The court set aside the verdict and directed a new trial.
In General Exch. Ins. Corp. v. New York City Tr. Auth. (20 Misc. 2d 2 [Hart, J.]) the Appellate Term in the Second Department, had before it an appeal from an order of the Municipal Court which granted a motion to set aside the verdict of the jury and ordered a new trial. In affirming the court below, the Appellate Term said (pp. 4^5):
“ Concerning interference with verdicts generally, it is the rule that a trial court may not substitute its judgment for that "of the jury, but when it does set aside a verdict its determination will not be disturbed unless there has been an abuse of discretion. (Coleman v. Brooklyn & Queens Tr. Corp. [252 App. Div. 215], supra; Robinson v. Interurban St. Ry. Co., 113 App. Div. 46.) This is upon the theory that the Trial Justice was in the atmosphere of the trial, observed the witnesses, heard their testimony, and was in a better position to judge their credibility, while an appellate court has only the printed record before it. (Cf. Kligman v. City of New York, 281 App. Div. 93.) Even when the record presents clear-cut questions of fact, an appellate court may, nevertheless, properly decline to say that the Trial Justice erred in setting aside the jury’s verdict. (Weber v. Steingart, 219 App. Div. 833.)
“ In Mann v. Hunt (283 App. Div. 140, 141-142), the court (per Bebgaít, J.) cogently stated the applicable rule as follows:
‘“A court which reviews the weight of evidence as well as the law, as does an Appellate Division, must approach an appeal from a decision by a trial judge setting aside a verdict in the light of the nature of the duty and the subtle and not easily definable measure of responsibility which the judge exercises in decision.
“ 1 The duty of the judge to supervise the reasonableness of the verdicts returned to him ought to be viewed liberally on *1053 appeal because the independence of mind with which that duty is exercised is ingredient to the sound health of the judicial process. (Lipshitz v. Sloan, 280 App. Div. 855.)
“ ‘ Even if the judges who look at the case on appeal would not themselves have set the verdict aside had they acted in the first instance, they should not find in this alone a ground for reversal. If the case comes within the area within which judicial interference would not be regarded by the profession as unreasonable, the exercise of the power thus to deal with the verdict ought to be upheld. * * *
‘ ‘ ‘ It is our view that the case lies well within the area of the judge’s power to set the verdict aside in the supervision of the jury’s work before him. Having himself heard the facts developed from the witnesses and sensed the atmosphere and texture of the trial, he had the duty of maintaining reasonable consistency between the weight of evidence and the verdict reached. * * *
it t There is “no standard by which to determine ” when a verdict should be set aside as against the weight of evidence. The decision “depends upon the discretion of the court ” (McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 66, 69).’
“ In the present case it cannot be said that the plaintiffs have shown the absence of a reasonable basis for the setting aside of the verdict. The Trial Justice who had the advantage, denied this court, of observing the witnesses as they gave their testimony, was no doubt convinced that the jury’s verdict was against the weight of the credible evidence. I think we should hesitate to say that its conclusion was unfounded, especially in view of the contradictions in the plaintiffs’ proof as to the manner in which the accident occurred and in other aspects of their case.
‘ ‘ Upon this record and in the light of the applicable principles governing appellate courts in situations of this kind, it is my view that the discretion of the trial court in setting aside the verdict and ordering a new trial was properly exercised and should not be disturbed.”
It is the court’s feeling that the verdict of this jury may not stand. Plaintiff is an innocent victim of this accident, and he should not be permitted, with the court’s sanction, to become, in addition, the victim of unfair trial practices. Despite the practice of not setting aside jury verdicts in favor of a defendant in a tort case, where the interests of justice require that it be done it is the court’s duty to do so.
Accordingly, the motion made by the plaintiff at the end of the case to set aside the verdict of the jury is in all respects granted, the verdict is set aside, and the case is restored to the *1054 Trial Term Day Calendar for a date which may be agreed upon between counsel, or which will be fixed in the order which is to be entered herein. Such order should be settled on two days’ notice. The exhibits in this case which have been retained by the court, will be returned to the counsel entitled thereto. For that purpose, counsel should arrange an appointment so that they may together appear before the court and agree upon who is entitled to said exhibits. If either counsel desires that any of the exhibits shall remain with the court for such future use as may be necessary, an application to impound such exhibits may be made at said time and the court will then consider such requests. Defendant is granted an exception to the determination herein made.